UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FELICIA M.,[1] | ) |
| | ) No. 19 CV 2379 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| ANDREW M. SAUL, Commissioner of | ) |
| Social Security, | ) |
| | ) September 28, 2020 |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Felicia M. ("Felicia") seeks disability insurance benefits ("DIB") based on her claim that she is disabled by diabetes, obesity, status-post bariatric surgery, degenerative joint disease, sleep apnea, depression, and anxiety. Before the court are the parties' cross-motions for summary judgment. For the following reasons, Felicia's motion is granted, the government's is denied, and the matter is remanded:

**Procedural History**

Felicia filed her DIB application in December 2015 alleging a disability onset date of January 1, 2014. (Administrative Record ("A.R.") 17, 185-91.) After her application was denied initially and upon reconsideration, (id. at 106-10, 112-17), Felicia requested and was granted a hearing before an administrative law judge ("ALJ"), (id. at 118-19). Felicia appeared for a hearing in December 2017 along with her attorney, a medical expert ("ME"), and a vocational expert ("VE"). (Id. at 34-65.)

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect her privacy to the extent possible.

The ALJ issued a decision in March 2018 finding that Felicia is not disabled. (Id. at 17-27.) When the Appeals Council declined Felicia's request for review, (id. at 1-5), the ALJ's decision became the final decision of the Commissioner, *see Jeske v. Saul*, 955 F.3d 583, 597 n.2 (7th Cir. 2020). Felicia then filed this lawsuit seeking judicial review, and the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 14).

## The ALJ's Decision

The ALJ followed the required five-step process in evaluating Felicia's DIB claim. *See* 20 C.F.R. § 404.1520(a). At step one the ALJ found that Felicia had not engaged in substantial gainful activity since January 1, 2014, her alleged disability onset date. (A.R. 19.) At step two the ALJ concluded that Felicia has the following severe impairments: diabetes mellitus; morbid obesity; status-post bariatric surgery; degenerative joint disease; obstructive sleep apnea; depression; and generalized anxiety disorder. (Id.) At step three the ALJ determined that Felicia's impairments do not meet or medically equal any listed impairment. (Id. at 19-20.) Before turning to step four, the ALJ assessed Felicia as having a residual functional capacity ("RFC") to perform sedentary work with limitations, including that she can: occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; occasionally balance, stoop, crouch, and crawl, but never kneel; frequently reach in all directions, including overhead with both upper extremities; frequently handle, finger, and feel with both upper extremities; have no exposure to and/or work around vibration or hazards; and perform simple, routine tasks requiring no more

than short, simple instructions and simple, work-related decision-making with few workplace changes. (Id. at 21.) At step four the ALJ found that Felicia is unable to perform her past relevant work, but at step five the ALJ determined that she can perform other jobs that exist in significant numbers in the national economy. (Id. at 25-26.)

## Analysis

Felicia asserts that the ALJ erred by: (1) failing to support her symptom evaluation with substantial evidence; (2) incorrectly weighing the primary care nurse practitioner's opinion; and (3) improperly assessing her mental RFC. (R. 22, Pl.'s Br. at 4-15.) This court reviews the ALJ's decision to ensure that it is supported by substantial evidence, meaning "more than a mere scintilla" but no more than "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations and citations omitted). To adequately support a decision, the ALJ must "build a logical bridge from the evidence to his conclusion" that the claimant is not disabled. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The court's role is neither to reweigh the evidence nor to substitute its judgment for the ALJ's. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013); *Simons v. Saul*, 817 Fed. Appx. 227, 230 (7th Cir. 2020) ("[W]e may not usurp the ALJ's judgment by reevaluating evidence or making our own credibility determinations."). That said, if the ALJ committed an error of law or "based the decision on serious factual mistakes or

3

omissions," reversal is required. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

## A. Symptom Assessment

The court begins its analysis with Felicia's challenge to the ALJ's assessment of her symptom statements because that assessment informs several aspects of the ALJ's decision, including the RFC analysis. *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (noting that an erroneous credibility determination requires remand unless the remainder of the ALJ's decision does not depend on it). An ALJ's symptom evaluation is entitled to great deference because the ALJ is able to observe and assess the claimant's testimony first-hand. *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). As such, a reviewing court may only reverse a symptom assessment where it is "patently wrong." *Id.* at 816. The court will not disturb an ALJ's evaluation of a claimant's symptom description if it is logically based on specific findings and evidence in the record. *See Murphy*, 759 F.3d at 815. That said, "when a credibility finding rests on objective factors or fundamental implausibilities, rather than on a claimant's demeanor or other subjective factors," the court's ability to review the assessment is less constrained. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (internal quotation omitted).

Felicia argues that the ALJ erred in evaluating her symptom statements. (R. 22, Pl.'s Br. at 13-15.) During the administrative hearing, Felicia testified that she stopped working as a home health care provider in 2016 because of her lower back and foot pain. (A.R. 39.) She said that she cannot stand on her feet for long

4

periods, bend, lift, dress, or bathe herself, or drive more than a few times each year. (Id. at 39-41, 48, 54.) She had bariatric surgery to help alleviate hip pain, but it did not resolve her pain. (Id. at 47-48.) In her consultative mental examination Felicia reported that she experiences "overwhelming pain in her feet" and that she "struggles to sit, stand, and walk for extended periods of time." (Id. at 577.) Her feet "tingle" and "hurt" all day and, according to her, she scratches them "until they bleed." (Id.; see also id. at 578 (noting during February 2016 mental examination that Felicia used a fork to scratch her feet).) Felicia testified that the itching in her feet causes her anxiety, and she also suffers from depression and suicidal thoughts. (Id. at 49.) She said her mental impairments cause her to have difficulty concentrating for more than 10 to 15 minutes. (Id. at 50.)

In determining that Felicia's symptoms are less severe than alleged, the ALJ relied on Felicia's "conservative" and "sporadic" treatment. (Id. at 23-24.) Felicia contends that the ALJ erred by inferring that her treatment was conservative, without providing record support or explaining her finding. (See R. 22, Pl.'s Br. at 13 (citing *Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009)).) Felicia further asserts that the ALJ characterized her treatment as sporadic without exploring the reasons why Felicia's treatment was irregular. (Id. at 14.) The government responds by pointing out that Felicia's only surgery for a physical impairment was a laparoscopic gastrectomy and, despite alleging that her disability began in January 2014, Felicia was not treated for mental impairments until three years later in February 2017. (R. 26, Govt.'s Br. at 13-14.)

5

While the ALJ's symptom assessment is entitled to great deference, here the ALJ failed to support her findings with substantial evidence. As Felicia points out, the ALJ characterized her treatment as being "conservative" and "sporadic" without explaining how Felicia's treatment was inconsistent with her symptom allegations. (See A.R. 23.) For support the ALJ referred to her "above" analysis, (id.), but in her prior discussion the ALJ mentioned only in cursory fashion that Felicia "maintained her functional ability with conservative treatment," (id. at 20). Where, as here, the ALJ's determination "lacks adequate discussion of issues," it must be remanded. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

In an effort to supply the substantial evidence lacking in the ALJ's symptom analysis, the government points to statements purportedly supporting the ALJ's characterization of Felicia's treatment as conservative. (R. 26, Govt.'s Br. at 14.) The government cites to the ALJ's statement that despite "a notable history of diabetes mellitus with diagnosed peripheral neuropathy," February 2015 treatment records state that her diabetes was "controlled." (Id. (citing A.R. 22, 428).) However, the ALJ never explained how this evidence supports her conclusion that Felicia received only conservative treatment, and other 2015 records confirm Felicia's diagnosis of Type 2 uncontrolled diabetes. (See, e.g., A.R. 474, 477.) The government also notes the ALJ's statement that Felicia's obstructive sleep apnea "improved with use of a continuous positive airway pressure (CPAP) machine." (Id. (citing A.R. 23, 709).) While a December 2016 visit summary notes that Felicia "[f]eels better with CPAP usage," (A.R. 709), the records cited do not indicate an

6

improvement permitting Felicia to sustain competitive work, (id. at 709, 714, 721). To the contrary, the records continue to list obstructive sleep apnea as one of Felicia's diagnoses and note that she has been unable to work. (Id. at 709, 719.) In any event, the ALJ improperly inferred that Felicia's treatment was conservative without providing adequate support or explanation. *See Myles*, 582 F.3d at 677-78.

Similarly, the ALJ improperly characterized Felicia's treatment from specialists as sporadic and relied on the purported fact that their objective findings did not support her allegations, without providing the necessary support. (A.R. 23.) To the extent an ALJ relies on a claimant's failure to seek or receive treatment, she must consider why the claimant was unable to "keep up with her treatment." *Myles,* 582 F.3d at 677; *see also Beardsley*, 758 F.3d at 840. An inability to afford treatment or a failure to seek consistent treatment because of mental impairments can provide valuable "insight" as to a lack of treatment or consistent treatment. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008); *see also Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (recognizing that mental illness "may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment").

Here the ALJ did not question Felicia about why she did not seek "dedicated" mental health treatment until February 2017. (A.R. 23, 38-47.) Nor did the ALJ explain which specialists' "objective findings" conflict with Felicia's symptom allegations. (Id. at 23.) Despite previously discussing Felicia's "insurance issues," which resulted in her only being able to use "less effective medications," (id. at 22),

7

the ALJ did not consider the extent to which financial, mental health, or other factors may have contributed to her infrequent treatment. In her reply Felicia notes that the government did not address this argument, suggesting that it "has no appropriate response." (R. 29, Pl.'s Reply at 7.) Given the ALJ's failure to ascertain why Felicia sought and received only sporadic treatment, and the government's inability to defend the ALJ on this issue, the court finds this reason insufficient to support the symptom analysis.

The government tries to save the ALJ's symptom evaluation by supplying citations to objective evidence that it argues conflict with Felicia's symptom statements. (R. 26, Govt.'s Br. at 13 (citing A.R. 474, 480-91, 493-94, 576, 578, 695, 706, 773-74, 777, 803, 942, 955-56, 958).) According to the government, that evidence shows "mostly-normal to normal exam findings." (Id.) But the ALJ did not supply this evidence as a ground for discrediting Felicia's symptom statements. And even if she had, Felicia points to diagnostic findings supporting her pain allegations and abnormal findings that the ALJ failed to consider. (R. 29, Pl.'s Reply at 6 (citing A.R. 459, 632, 593, 598).) An ALJ cannot disregard an entire line of contrary evidence. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

Even if the objective evidence cited by the government supports the ALJ's assessment, Felicia notes that the ALJ did not address her daily activities or

8

medication side effects, as required by SSR 16-3p. (R. 22, Pl.'s Br. at 14-15.) The government responds that the ALJ discussed Felicia's daily activities when addressing the paragraph B criteria at step three. (R. 26, Govt.'s Br. at 15.) At step three the ALJ mentioned that Felicia "did not need reminders for daily activities" and "maintained the ability to make simple meals and do basic chores." (A.R. 20.) But the ALJ did not consider Felicia's daily activities in the context of evaluating the "intensity, persistence, and limiting effects" of her symptoms, and her brief mention of this factor at step three sheds no light on how it informed her symptom assessment. *See* SSR 16-3p, 2017 WL 5180304 at *7-8. The same is true with respect to Felicia's medication side effects. *See id.* While not all reasons underlying an ALJ's symptom assessment must be valid, here the symptom evaluation lacks the support of substantial evidence.

**B.     Opinion Evidence**

Felicia also argues that the ALJ erred by assigning "no weight" to treating nurse practitioner Linda Hushaw's opinion that Felicia can sit for less than 30 minutes at a time and less than 3 hours in an 8-hour workday and stand or walk for less than 15 minutes at one time and less than 30 minutes in an 8-hour workday. (A.R. 936.) Hushaw also opined that Felicia: would need to recline frequently in an 8-hour workday; can lift and carry up to 20 pounds occasionally; and should avoid bending, squatting, or reaching. (Id.) The ALJ rejected Hushaw's opinion because, she said, Hushaw did not explain her RFC assessment and her findings were inconsistent with the record. (Id. at 24.) The ALJ reasoned that Felicia

9

"maintained good strength and required generally conservative treatment," there was no objective evidence supporting a 30-minute sitting restriction, and Hushaw's treatment notes did not reflect a need to recline. (Id.)

Felicia argues that substantial evidence does not support the ALJ's opinion evaluation because she did not apply the checklist of factors required by SSR 06-3p, she failed to consider the extent to which Hushaw's opinion was consistent with the record, and she did not use "sound reasoning." (R. 22, Pl.'s Br. at 4-10.) The government responds that Hushaw, as a nurse practitioner, was not an acceptable medical source and, as such, her opinion could be afforded less weight than a treating physician's opinion. (R. 26, Govt.'s Br. at 2 (citing 20 C.F.R. § 404.1502(a)).) The government also argues that the ALJ considered the checklist of factors in the applicable regulation, 20 C.F.R. § 404.1527(c), and supplied substantial evidence to support her evaluation. (R. 26, Govt.'s Br. at 2-9.)

As an initial matter, Felicia argues that the ALJ violated SSR 06-3p by not applying that regulation in her evaluation of Hushaw's opinion. (R. 22, Pl.'s Br. at 5.) In response the government correctly points out that SSR 06-3p does not apply to claims pending or filed after March 27, 2017, and the ALJ's decision issued on March 23, 2018. (R. 26, Govt.'s Br. at 5-6.) Although the Federal Register initially noted that SSR 06-3p was being rescinded for claims filed on or after March 27, 2017, 82 Fed. Reg. 15263 (March 27, 2017), a correction notice issued on April 6, 2017, noting that SSR 06-3p no longer applies to claims pending or filed after March 27, 2017, 82 Fed. Reg. 16869 (April 6, 2017). Instead, 20 C.F.R. § 404.1527(c)

10

provides the correct framework for evaluating an opinion from a non-acceptable medical source. (See R. 26, Govt.'s Br. at 2.)

Even using § 404.1527(c) as the applicable standard, Felicia argues that the ALJ failed to properly consider the checklist factors. (R. 29, Pl.'s Reply at 1-4.) When weighing medical opinions, an ALJ must consider certain regulatory factors, including the length, nature, and extent of the treatment relationship, the supportability of the medical source's opinion, the opinion's consistency with the record, and the source's specialization. 20 C.F.R. § 404.1527(c); *see also Walker v. Saul*, ___ Fed. Appx. ___, 2020 WL 1698857, at *3 (7th Cir. April 8, 2020). The ALJ also "must consider the entire record, including all relevant medical and nonmedical evidence," and adequately explain how she weighed an opinion in light of the record. *Murphy v. Astrue*, 454 Fed. Appx. 514, 518 (7th Cir. 2012) (internal quotations and citations omitted). The government argues that the ALJ "more than met" this standard in weighing Hushaw's opinion. (R. 26, Govt.'s Br. at 2.)

The court agrees with the government, finding that the ALJ adequately considered the § 404.1527(c) factors and evidence of record and provided good reasons why she accorded no weight to Hushaw's opinion. In terms of the nature and extent of the treatment relationship, the ALJ noted that Hushaw was Felicia's primary care provider and that Felicia visited her periodically for "routine care." (A.R. 22-23.) The ALJ next considered the consistency of Hushaw's opinion with the overall record and found that Hushaw's findings were inconsistent with the evidence of record. (Id. at 24.) For example, although Hushaw opined that Felicia

11

has significant limitations, the ALJ discussed treatment records showing that Felicia had "intact sensation to light touch, normal range of motion, intact strength, and a normal gait." (Id. at 22.) Felicia also could "walk without an assistive device, perform toe/heel walk; and had normal range of motion of her musculoskeletal system." (Id.) Furthermore, Felicia had "intact neurologic functioning, including strength and sensation." (Id.) Felicia did have laparoscopic sleeve gastrectomy in June 2017 but "tolerated the surgery with no difficulties controlling her pain." (Id. at 23.)

As to the supportability of Hushaw's opinion, the ALJ noted that Hushaw "did not provide any explanation or reasoning for her assessment" and her treatment notes did not support a need to recline. (Id. at 24.) Felicia argues that the nature of the form used by Hushaw did not allow for a narrative, and that the ALJ should have contacted her if she needed an explanation. (R. 22, Pl.'s Br. at 7.) But the ALJ was not required to contact Hushaw simply because she found her opinion unsupported. *See* 20 C.F.R. § 404.1520b(b)(2)(i); *Bailey v. Colvin*, No. 12 CV 9659, 2015 WL 7251939, at *8 (N.D. Ill. Nov. 17, 2015)); *see also Britt v. Berryhill*, 889 F.3d 422, 427 (7th Cir. 2018) (finding that an ALJ need not recontact a physician where "the record contain[s] adequate information for the ALJ to render a decision").

As the government points out, the ALJ considered and relied on "the cogent and persuasive opinion testimony provided by the impartial medical expert," (A.R. 24), who assessed that Felicia can perform sedentary work with occasional

12

postural activities, (id. at 59).² (R. 26, Govt.'s Br. at 8); *see Gebauer v. Saul*, 801 Fed. Appx. 404, 408 (7th Cir. 2020) ("An ALJ may obtain a medical expert's opinion for several reasons including, in relevant part, 'to clarify and explain the evidence or help resolve a conflict because the medical evidence is contradictory, inconsistent, or confusing' and to determine the claimant's [RFC].") (citing HALLEX I-2-5-34(A)(2) (2016)). The ALJ also assigned significant weight to the opinions of the state agency reviewing physicians. (A.R. 24, 73-75, 92-94.) Felicia claims the ALJ erred by assigning more weight to reviewing physicians' opinions than she did to the treating nurse practitioner's opinion. (R. 29, Pl.'s Reply at 4.) But an ALJ may rely on a reviewing physician's opinion, provided that later evidence does not "change[] the picture so much that it reasonably could have changed" the opinion. *Massaglia v. Saul*, 805 Fed. Appx. 406, 410 (7th Cir. 2020). Where, as here, the ALJ assessed the relevant factors and provided substantial evidence to support her opinion evaluation, the court finds no error in her assessment.

Having so ruled, the court addresses one final argument made by Felicia in challenging the ALJ's evaluation of Hushaw's opinion. Felicia asserts that the ALJ discounted Hushaw's opinion because Felicia generally required "conservative treatment." (R. 22, Pl.'s Br. at 8.) As discussed above with respect to the ALJ's symptom assessment, the ALJ did not explain what treatment Felicia received that was conservative. Nonetheless, in weighing the opinion evidence the ALJ was only required to "minimally articulate" her reasons for assigning certain weight to

---

² The ME opined solely on Felicia's physical impairments, not her mental impairments, given that his expertise is in internal medicine. (A.R. 58-59.)

13

Hushaw's opinion. *See Eakin v. Astrue*, 432 Fed. Appx. 607, 611 (7th Cir. 2011). Here the ALJ satisfied that standard, so any error in not explaining what she meant by conservative treatment in the context of her opinion evaluation amounts to no more than harmless error.

**C.     RFC Assessment**

Felicia argues that the ALJ's mental RFC was not supported by substantial evidence.  (R. 22, Pl.'s Br. at 10-13.)  The issue of whether an RFC adequately captures moderate mental limitations has become fertile ground for litigation, likely because the caselaw governing this issue is context- and case-specific.  The Seventh Circuit has made clear that the RFC must account for even moderate limitations. *See Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).  While "specific" words are not required, an ALJ must provide a sufficient basis to account for limitations, rather than simply relying on "catch-all terms like 'simple, repetitive tasks.'" *Id.*  Limiting a claimant to "unskilled work" says nothing about a claimant's ability to concentrate, stay on task, or maintain a given pace where concentration, persistence, or pace ("CPP") limitations are present. *Martin v. Saul*, 950 F.3d 369, 373-74 (7th Cir. 2020).

The ALJ found that Felicia has severe mental impairments of depression and generalized anxiety disorder.  (A.R. 19; see also id. at 675, 685, 785, 840-42, 938, 943 (treatment records assessing Felicia as having paranoid schizophrenia, recurrent major depressive disorder (severe with psychotic symptoms), and generalized anxiety disorder).)  When considering the paragraph B criteria to

14

determine the severity of these mental impairments, the ALJ found that Felicia has moderate limitations in CPP and mild limitations in interacting with others and adapting and managing oneself. (Id. at 20.) In her mental RFC assessment, the ALJ limited Felicia to "simple, routine tasks requiring no more than short, simple instructions and simple, work-related decision-making with few workplace changes." (Id. at 21.) Felicia asserts that these limitations do not adequately account for her mental impairments, and that off-task time and social interaction limitations should have been considered. (R. 22, Pl.'s Br. at 10-13.)

Felicia first argues that the ALJ's mental RFC addressed only the "complexity of tasks" Felicia could perform and not her CPP limitations. (Id. at 10-11.) The Seventh Circuit recently explained the disconnect between limiting a claimant to unskilled work and adequately accounting for CPP limitations:

> [T]he relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace. . . . Put another way, someone with problems concentrating may not be able to complete a task consistently over the course of a workday, no matter how simple it may be.

*Martin*, 950 F.3d at 369. In that case, the court upheld the ALJ's RFC assessment where it included "pace-related limitations" providing the claimant with flexibility and goal-oriented work requirements. *Id.* at 374. By contrast, in another Seventh Circuit case in which the ALJ's RFC limited the claimant to "'simple, routine, repetitive tasks' with few workplace changes," the court found such language insufficient to account for the likelihood that the claimant would be off task up to 20 percent of the time. *Crump*, 932 F.3d at 569-70.

15

Given this guidance, the court agrees with Felicia that the ALJ's RFC did not properly account for her CPP limitations. The ALJ assessed Felicia as having moderate CPP limitations and cited testimony and evidence supporting this finding. To be sure, the ALJ noted Felicia's testimony that she can pay attention for only about two to three minutes and cannot complete activities she starts. (A.R. 20 (citing id. at 328); see also id. at 22 (citing id. at 50 (noting Felicia's testimony that her depression and anxiety limit her ability to concentrate for more than 10 to 15 minutes)).) The ALJ also pointed to treatment records documenting auditory hallucinations, which she found "reasonably affect[]" Felicia's CPP functioning. (Id. at 20; see also id. at 800, 802, (reporting that Felicia has been hearing voices since age 15), 820, 823, (noting "[a]n increase in hearing voices"), 941 (noting that Felicia "[c]ontinues to hear voices daily"), 951 (reporting that Felicia was hearing voices).) The ALJ further noted that during a consultative mental examination Felicia reported depression, resulting in decreased concentration. (Id. at 23 (citing id. at 577).) And both state agency psychologists, to whom the ALJ afforded "some weight," (id. at 25), determined that Felicia was moderately limited in her ability to maintain attention and concentration for extended periods.[3] (Id. at 75-76, 94-95.)

---

[3] Dr. Kathryn Murphy performed a mental status examination and similarly found that Felicia's "increased anxiety [appeared to] adversely impact[] her attention, concentration, and immediate recall." (A.R. 579; see also id. at 578 (observing that Felicia was "restless throughout the evaluation" and "struggled to complete the tasks" assigned).) Dr. Murphy noted Felicia's reports that she participated in special education classes throughout high school because of her difficulty concentrating and opined that Felicia would not be able to manage her own funds if awarded disability benefits. (Id. at 578-79; see also id. at 54.) The ALJ afforded Dr. Murphy's opinion only "limited weight." (Id. at 25.)

16

Here, despite assessing Felicia as having moderate CPP limitations, the ALJ did not account for such limitations in her mental RFC. Instead, the ALJ merely limited Felicia to "simple, routine tasks" with "short, simple instructions" and "simple work-related decision-making," without explaining how these restrictions would permit Felicia to stay on task, perform at the pace required, or maintain a sufficient level of concentration to complete a task over the course of a workday. *See* Martin, 950 F.3d at 369. In short, the mental RFC did not adequately capture Felicia's CPP limitations.

The government argues that the ALJ's mental RFC should be upheld, relying for support primarily on the Seventh Circuit's decision in *Jozefyk v. Berryhill*, 923 F.3d 492, 497-98 (7th Cir. 2019). (R. 26, Govt.'s Br. at 9-10.) In *Jozefyk* the Seventh Circuit affirmed an ALJ's translation of moderate CPP limitations into restrictions to simple, repetitive tasks and limited interactions with others, finding such language sufficient where medical evidence showed impairments present only when the claimant was with other people or in a crowd. *Id.* at 498. The Seventh Circuit recently explained, however, that the *Jozefyk* decision was based on a lack of testimony and medical evidence supporting CPP limitations. *See Crump*, 932 F.3d at 571. That is not the case here. (See A.R. 50, 328, 817, 848, 941 (testimony and treatment records reporting impaired concentration).)

The government also contends that the ALJ was not required to account for the state agency psychologists' "itemized selection in the worksheet" indicating that Felicia was moderately limited in her ability to maintain attention and

17

concentration for extended periods. (R. 26, Govt.'s Br. at 11 & n.4 (citing A.R. 75, 94).) After all, the government asserts that in their narratives the psychologists opined that Felicia could perform simple tasks on a sustained basis, ideally in a work setting with "low social contact." (Id. at 11-12.) As Felicia points out, however, in *DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019), the Seventh Circuit found that even where an ALJ relies on "a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms." The ALJ in this case did not explain how a limitation to simple tasks accounted for the reviewers' check-box determination that Felicia was moderately limited in her ability to maintain attention and concentration for extended periods. (A.R. 25.)

Likewise, in her mental RFC the ALJ did not adequately account for Felicia's social functioning limitations. Despite giving some weight to the state agency psychologists' opinions, and in particular to their opinions that Felicia would perform best in "settings of low social contact," (id. (citing id. at 77, 96)), the ALJ's mental RFC did not include any social interaction limitations, (id. at 21). Both state agency psychologists determined that Felicia was moderately limited in interacting with the public. (Id. at 76, 95.) The ALJ disagreed, finding that "given [Felicia's] cooperative and polite behavior, good familial relationships, and ability to get along with authority figures," she had "no work-related social limitations." (Id. at 25.) But in so deciding, the ALJ did not explain how cooperative or polite behavior, or even good familial relationships, translate into a greater ability to socially interact

18

with others.  Additionally, while Felicia stated in a function report that she got along "very well" with authority figures, she qualified her response by noting, "I try at anny [sic] rate."  (Id. at 329.)  The ALJ did not mention Felicia's qualification.  (Id. at 25.)

The government argues that "any failure to include social limitations in the RFC finding was indeed harmless error at most."  (R. 26, Govt.'s Br. at 12.)  The government explains that when the ALJ added social limitations to the hypothetical posed to the VE, those limitations did not affect the availability of identified jobs.  (Id.)  Regardless, because the ALJ did not sufficiently account for Felicia's CPP limitations, remand is required so that her mental RFC may be reassessed.  On remand the ALJ also should reconsider Felicia's mental RFC in light of her social interaction limitations.

## Conclusion

For the foregoing reasons, Felicia's motion for summary judgment is granted and the government's motion is denied.

ENTER:

_____
Young B. Kim
United States Magistrate Judge